**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| LEAVENWORTH WATERWORKS,<br><br>Plaintiffs<br><br>v.<br><br>3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.);<br>AGC CHEMICALS AMERICAS INC.;<br>AMEREX CORP.;<br>ARCHROMA U.S., INC.;<br>ARKEMA, INC.;<br>BASF CORPORATION;<br>BUCKEYE FIRE EQUIPMENT COMPANY;<br>CARRIER GLOBAL CORPORATION;<br>CHEMDESIGN PRODUCTS, INC.;<br>CHEMGUARD, INC.;<br>CHEMICALS INCORPORATED;<br>THE CHEMOURS COMPANY;<br>THE CHEMOURS COMPANY FC, LLC;<br>CHUBB FIRE, LTD.;<br>CLARIANT CORPORATION; CORTEVA, INC.;<br>DEEPWATER CHEMICALS, INC.;<br>DUPONT DE NEMOURS, INC.;<br>DYNAX CORPORATION;<br>E. I. DUPONT DE NEMOURS AND COMPANY;<br>KIDDE PLC, INC.;<br>NATION FORD CHEMICAL COMPANY;<br>NATIONAL FOAM, INC.;<br>UNITED TECHNOLOGIES CORPORATION;<br>TYCO FIRE PRODUCTS LP; and<br>UTC FIRE & SECURITY AMERICAS CORPORATION, INC.;<br><br>Defendants. | MDL No.: 2873<br><br>Master Docket No.: 2:18-mn-2873<br><br>JUDGE RICHARD GERGEL<br><br>Civil Case No.: ______________<br><br>DIRECT FILED COMPLAINT AND JURY DEMAND PURSUANT TO CASE MANAGEMENT ORDER NO. 3 |

# PLAINTIFF'S COMPLAINT

Plaintiff, LEAVENWORTH WATERWORKS, (hereinafter "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants, 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), AGC Chemicals Americas, Inc., Amerex Corp., Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, The Chemours Company, The Chemours Company FC, LLC, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours, Inc., Dynax Corporation, E. I. DuPont De Nemours and Company, Kidde PLC, Inc., Nation Ford Chemical Company, National Foam, Inc., United Technologies Corporation), Tyco Fire Products LP (individually and as successor-in-interest to The Ansul Company), and UTC Fire & Security Americas Corporation, Inc., and alleges as follows:

## SUMMARY OF THE CASE

1. Plaintiff brings this action against Defendants to address PFAS impacts to its public water system (KS2010317) caused by Defendants' Aqueous Film Forming Foam (AFFF) products.

2. AFFF contains per- and polyfluoroalkyl substances collectively known as "PFAS."[1] PFAS are man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety, as well as the environment.

3. Since the 1960's through present, Defendants collectively designed, manufactured,

[1]" PFAS" includes but is not limited to: perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS") and related chemicals, including but not limited to those that degrade to PFOA and/or PFOS, and including but not limited to C3-C-15 PFAS chemicals, such as perfluorohexanesulfonate (PFHxS), perfluorononanoate (PFNA), perfluorobutanesulfonate (PFBS), perfluorohexanoate (PFHxA), perfluoroheptanoate (PFHpA), perfluoroundecanoate (PFUnA), perfluorododecanoate (PFDoA), HFPA Dimer Acid (commonly known as GenX chemicals), and HFPA Dimer Acid Ammonium Salt (commonly known as GenX chemicals)

marketed, sold and/or distributed PFAS, PFAS precursors, and/or AFFF products containing PFOA, PFOS and/or their chemical precursors (collectively, "PFAS Products").

4. Military bases, airports, fire stations, industrial plants, refineries, and fire training centers regularly used AFFF in training exercises as well as live fire emergency scenarios to suppress and extinguish Class B fuel fires since the 1960's.

5. Defendants knew that the use of PFAS bearing AFFF in fire protection, training, and response activities, even when used as directed and as intended by the Defendants, would release PFAS compounds into the environment. Defendants also possessed knowledge that these chemicals would persist in the environment and would not degrade, posing an indefinite threat to public health.

6. As a result of the occurrence of PFAS in the environment from Defendants' AFFF products, Plaintiff will incur costs to investigate, delineate, and/or remediate PFAS impacts to its public water system. More likely than not, Plaintiff will need to fund and implement additional capital costs, and will incur future ongoing operational and maintenance costs, in order to sample, remediate, remove, and/or treat for PFAS contamination.

## PARTIES

7. Plaintiff, LEAVENWORTH WATERWORKS, is a public corporation duly created under the laws of the State of Kansas, owned and governed by the City of Leavenworth, its primary place of business being at 601 Cherokee Street, Leavenworth, KS 66048.

8. Plaintiff owns and operates a public community water system (KS2010317) which upon information and belief is more likely than not impacted by Defendants' PFAS containing AFFF products.

9. Plaintiff has standing to recover damages incurred as a result of Defendants' actions and

omissions. Plaintiff has standing to bring all claims pled herein.

10. Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the PFAS Products/Components that have and continue to impact the public water system (KS2010317).

a. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation authorized to conduct business in Kansas, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. 3M manufactured and/or sold AFFF containing PFAS in the United States, including Kansas.

    i. From the 1960's through 2002, 3M manufactured, distributed, and sold PFAS bearing products including AFFF. For more than four decades, 3M researched, designed, developed, manufactured, marketed, sold, and distributed products and raw materials containing PFAS in Kansas.

b. Defendant AGC Chemicals Americas, Inc. ("AGC America") is a corporation organized and existing under the laws of Delaware with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC America does and/or has done business throughout the United States, including in Kansas.

    i. AGC America and/or its affiliates manufactured PFAS and surfactants for use in AFFF sold in Kansas by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing

PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

c. Defendant, Amerex Corp. ("Amerex"), is an Alabama corporation organized and existing under the laws of Alabama and does business throughout the United States, including Kansas. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, AL 35173.

   i. In 2011, Amerex acquired Solberg Scandinavian AS, a European manufacturer of AFFF.

   ii. Upon information and belief, following this acquisition, Amerex designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

d. Defendant Archroma U.S., Inc. ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Archroma U.S., Inc. was previously registered to do and did business in Kansas.

   i. Archroma US manufactured and sold PFAS and/or their precursors for use in AFFF sold in Kansas by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

e. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in Kansas. Upon information and belief, Arkema, Inc. is the operating U.S. subsidiary of Arkema France, SA.

   i. Arkema, Inc., designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

f. Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF is registered to do business in Kansas. Upon information and belief, Ciba-Geigy Corp., Ciba Inc., and BASF does and/or has done business throughout the United States, including Kansas.

   i. BASF, as a successor-in-interest to Ciba-Geigy Corp. and Ciba Inc., manufactured and sold PFAS for use in AFFF sold in Kansas by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

g. Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. Buckeye does and/or has done business throughout the United States,

including in Kansas.

i. Buckeye designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

h. Defendant Carrier Global Corp. is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Carrier Global Corp. conducts business throughout the United States including Kansas.

i. Carrier Global Corp. inherited UTC's Fire & Security businesses, including the Chubb Fire and Kidde-Fenwall brands, when it was formed in March 2020. Carrier Global Corporation is the parent corporation of Kidde-Fenwal Inc., a manufacturer of AFFF which designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

i. Defendant ChemDesign Products, Inc. ("ChemDesign"), f/k/a "SpecialtyChem Acquisition Corp.", is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

i. ChemDesign manufactured PFAS for use in AFFF products sold throughout the United States, including in Kansas, by those who designed, marketed,

developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

j. Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

   i. Chemguard designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

k. Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

   i. Chem Inc. manufactured PFAS for use in AFFF products sold throughout the United States, including in Kansas, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

l. Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware

19899. Chemours is registered to do business in Kansas.

i. In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFASs and the products that contain PFASs.

ii. Chemours designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

m. Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899. Chemours FC is registered to do business in Kansas.

i. Upon information and belief, Chemours FC is a successor-in-interest to Dupont Chemical Solutions Enterprise.

ii. Chemours FC manufactured PFAS for use in AFFF products sold throughout the United States, including in Kansas, by those who designed, marketed, developed, manufactured, distributed, released, trained users,

produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

n. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ.

i. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

ii. Upon information and belief, Chubb was part of UTC Fire & Security Americas Corporation, Inc.

iii. Chubb Fire designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

o. Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is registered to do business in Kansas.

i. Clariant was a fluruotelomer manufacturer which produced fluorosurfactants for AFFF manufacturers that designed, marketed, developed, manufactured, distributed, released, trained users, produced

instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

p. Defendant Corteva, Inc. is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont. Corteva, Inc. is registered to do business in Kansas.

   i. Corteva designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

q. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801. Upon information and belief, this Defendant manufactured PFAS Products for use in AFFF sold throughout the United States, including in Kansas.

   i. Deepwater Chemicals manufactured PFAS for use in AFFF products sold throughout the United States, including in Kansas, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or

used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

r. Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont, Inc.) ("New Dupont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.

   i. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont").

   ii. New Dupont designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

s. Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States including Kansas. Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

   i. Dynax designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

t. Defendant E. I. DuPont De Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old Dupont has done business throughout the United States, including in Kansas where it is registered to do business.

   i. Since the 1950's, Old Dupont manufactured and sold PFAS for the manufacture of AFFF that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

   ii. In 2015, Old Dupont spun off its "Performance Chemicals" business to Chemours.

u. Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business located at One Carrier Place, Farmington, Connecticut 06034. Upon information and belief, Kidde PLC, Inc. does and/or has done business throughout the United States, including in Kansas.

   i. Upon information and belief, Kidde PLC was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

   ii. Kidde P.L.C. designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

v. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715 and it does business throughout the United States including in

Kansas.

i. Nation Ford manufactured PFAS for use in AFFF products sold throughout the United States, including in Kansas, by those who designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

w. Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501 and does business throughout the United States, including in Kansas.

i. National Foam is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam manufactures the Angus brand of AFFF products.

ii. National Foam designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

x. Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011. Tyco is registered to do business in Kansas.

i. Tyco is a subsidiary of Johnson Controls International, plc, an Irish public

limited company.

ii. Tyco is the successor-in-interest to the company formerly known as The Ansul Company ("Ansul") and manufactures the Ansul brand of products (Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul").

iii. Upon information and belief, Tyco/Ansul does and/or has done business throughout the United States, including in Kansas.

iv. Tyco/Ansul designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

y. Defendant United Technologies Corporation ("United Technologies") is a Delaware corporation with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. United Technologies does and/or has done business throughout the United States, including in Kansas.

i. Upon information and belief, Kidde-Fenwall, Inc. is part of the UTC Climate Control & Security unit of United Technologies.

ii. United Technologies designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

z. Defendant UTC Fire & Security Americas Corporation, Inc. (F/K/A GE Interlogix, Inc.) ("UTC") is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. UTC does and/or has done business throughout the United States, including in Kansas, where it was registered to do business.

   i. UTC designed, marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used AFFF containing PFAS that are the subject of this Complaint in such a way as to result in impacts to Plaintiff's public water system.

11. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

12. When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and Defendants, and the amount in damages exceeds the minimal jurisdictional limits of this Court.

14. This Court has personal jurisdiction over the Defendants as Defendants have engaged in regular, systematic, and substantial economic activities in Kansas. These continuous activities, including marketing, selling, and/or distributing AFFF or components to manufacture AFFF, are connected to the Plaintiff's claims as alleged herein.

15. Venue is appropriate in this judicial district pursuant to this Court's Case Management Order No. 3 ("CMO 3"). Plaintiff states that but for CMO 3 permitting direct filing in the United States District Court for the District of South Carolina, Plaintiff would have filed this Complaint in the United States District Court for the District of Kansas. Further, in accordance with CMO 3, Plaintiff hereby designates the United States District Court for the District of Kansas as the "Home Venue" as this case may have originally been filed there.

16. Home Venue is proper in the United States District Court for the District of Kansas pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Plaintiff is a governmental entity and a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A. AQUEOUS FILM FORMING FOAM - AFFF

17. In 1902, a Russian engineer and chemist, Aleksandr Loran, developed the first firefighting foam. Loran was working in the oil and gas industry trying to find a substance to combat petroleum-based fires for which water is ineffective. Loran's solution was the first firefighting foam which was able to extinguish oil and other flammable liquids-based fires by blanketing and smothering them.

18. Later iterations of AFFF utilized Per- and polyfluoroalkyl substances (PFAS) as a more

effective means of suppressing hydrocarbon fuel-based fires. PFAS are a group of manufactured chemicals used to make fluoropolymer coatings and products that resist heat, oil, stains, grease, and water.

19. Scientists first developed processes to commercially produce PFAS in the 1940s. In the 1950's, Defendant 3M started manufacturing the two most well-known and well-studied types of PFAS, namely Perfluorooctanoic acid (PFOA) and Perfluorooctanesulfonic acid (PFOS). PFOA and PFOS became popular for product applications because the fluoropolymer coatings allowed for the repelling of water, protecting of surfaces and resisting of heat, amongst other desirable properties.

20. Certain PFAS like PFOA and PFOS are a significant environmental concern because these substances do not break down, thus allowing them to move through soils and contaminate drinking water sources, as well as build up (bioaccumulate) in crops and wildlife.

21. In training and emergency use, firefighters would spray AFFF containing PFAS directly onto a petroleum-based fire, where the foam coats the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

22. AFFF can be made without PFOA, PFOS, or their precursor chemicals. Fluorine-free foams and short-chains foams do not release PFOA, PFOS, and/or their precursor chemicals into the environment. However, the AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or their chemical precursors.

23. PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

24. All other Defendants manufactured PFASs for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical

precursors to PFOA.

25. When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment. PFAS do not exist in nature and are entirely man-made substances.

26. Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

### B. THE CONTAMINANTS: PFOA & PFOS

27. PFOS and PFOA are the most widely studied of the PFAS chemicals because they are the two PFAS that have been produced in the largest amounts within the United States. PFOA and PFOS are man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as per- and polyfluoroalkyl substances ("PFAS").

28. PFOS and PFOA are extremely persistent in the environment and resistant to typical environmental degradation processes primarily because the chemical bond between the carbon and fluorine atoms is extremely strong and stable. PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. This bond is one of the strongest chemical bonds in nature and the resulting persistence has earned these synthetic substances the nickname "forever chemicals".

29. PFOA and PFOS are soluble and readily transportable via air and water. PFOA and PFOS will leach from the surface into groundwater where PFOA and PFOS are chemically stable and resist degradation.

30. PFAS from AFFF products used, stored, and/or disposed of as intended migrate into

groundwater, surface waters, stormwater, waste water, soil, and sediment.

31. The use of Defendants' PFAS Products as directed and intended by the Defendants resulted in the discharge of PFOA, PFOS, and/or their precursor chemicals into the environment in and around the service area of the Plaintiff's public water system.

32. Upon information and belief, PFAS from discharged AFFF products more likely than not impact the public water system (KS2010317). Extensive sampling is necessary to determine the extent of PFAS impacts and full scope of damage to Plaintiff.

33. Due to the persistent nature of these 'forever chemicals', PFAS have, and will continue to cause injury and damage to Plaintiff.

### C. PFOA & PFOS Health Effects

34. The majority of research on the potential human health risks of PFAS are associated with oral (ingestion) exposure. Limited data exist on health effects associated with inhalation or dermal exposure to PFAS. Most available toxicity data are based on laboratory animal studies. There are also several human epidemiological studies of PFOA and PFOS. Exposure to some PFAS above certain levels may increase risk of adverse health effects.

35. The available epidemiological and animal studies[2] suggest links between PFAS exposure and several negative health outcomes including:

a. Hepatic Effects (increased cholesterol, increased liver weight; hypertrophy);

b. Cardiovascular Effects (pregnancy-induced hypertension and pre-eclampsia)'

c. Endocrine Effects (thyroid disease);

d. Immune Effects (decreased vaccine response);

e. Respiratory Effects (asthma, COPD, bronchitis);

[2] See ATSDR "Toxicological Profile for Perfluoroalkyls, Draft for Public Comment" (2018) found online at https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf

f. Reproductive Effects (decreased fertility);

g. Skeletal Effects (osteoarthritis);

h. Developmental Effects (decreased birth weight)

i. Carcinogenic Effects (kidney, liver, testicular, prostate, non-Hodgkin's lymphoma)

36. Under the EPA's Guidelines for Carcinogen Risk Assessment (USEPA, 2005b), there is "suggestive evidence of carcinogenic potential" for PFOA.[3]

37. Similarly, the International Agency for Research on Cancer (IARC) classifies PFOA as "possibly carcinogenic to humans".[4] Higher PFOA serum levels may be associated with testicular, kidney, prostate, and ovarian cancers and non-Hodgkin lymphoma.[5]

38. Increases in prostate, kidney, and testicular cancers have been found in workers or in community members living near a PFOA facility.[6]

39. Animal studies for PFOA report developmental effects (survival, body weight changes, reduced ossification, delays in eye opening, altered puberty, and retarded mammary gland development), liver toxicity (hypertrophy, necrosis, and effects on the metabolism and deposition of dietary lipids), kidney toxicity (weight), immune effects, and cancer (liver, testicular, and pancreatic).[7] The animal toxicity studies available for PFOA also demonstrate that the developing fetus is particularly sensitive to PFOA-induced toxicity. Human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased

---

[3] EPA, "Guidelines for Carcinogen Risk Assessment" EPA-630-P-03-001F (2005).

[4] International Agency for Research on Cancer (IARC), "Agents Classified by the IARC Monographs, volumes 1-125" (2019); IARC "Monographs on the Identification of Carcinogenic Hazards to Humans" (2019).

[5] Vieria et al., "Perfluorooctanoic Acid Exposure and Cancer Outcomes in a Contaminated Community: A Geographic Analysis" Environ Health Perspect. 121(3): 318–323 (2013).

[6] ATSDR, "Public Health Statement, Perfluoroalkyls" (2015).

[7] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R-16-004 (2016).

vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (liver, testicular, and kidney).

40. For PFOS, epidemiological studies have reported associations between PFOS exposure and high serum cholesterol and reproductive and developmental parameters. Exposure to PFOS has caused hepatotoxicity, neurotoxicity, reproductive toxicity, immunotoxicity, thyroid disruption, cardiovascular toxicity, pulmonary toxicity, and renal toxicity in laboratory animals and many in vitro human systems.[8] These results and related epidemiological studies confirmed the human health risks of PFOS, especially for exposure via food and drinking water. Applying the EPA Guidelines for Carcinogen Risk Assessment, there is suggestive evidence of carcinogenic potential for PFOS.[9] Studies in animals have shown that PFOA and PFOS can cause cancer in the liver, testes, pancreas, and thyroid.

### D. PFOA & PFOS ENVIRONMENTAL EFFECTS

41. Due to the characteristics of these synthetic chemicals, PFOA and PFOS are a significant threat to drinking water supplies in the U.S. The natural breakdown of PFOA and PFOS over time is assumed to be virtually nonexistent. In addition to a resistance to natural degradation, PFOA/PFOS' highwater solubility causes significant mobility in soil and an affinity to leaching into groundwater. This problem is particularly magnified with respect to any municipality drawing its drinking water from an aquifer underlying a current or former military base or airport.

42. Once the "forever chemicals" PFOS and PFOA contaminate a groundwater source, water treatment will be necessary to resolve any threats to public health. Unfortunately, PFOS and PFOA resist most conventional chemical and microbial treatment technologies. Technologies with

[8] Zeng, et al, "Assessing the human health risks of perfluorooctane sulfonate by in vivo and in vitro studies" Environment International Volume 126, May 2019, Pages 598-610 (2019).
[9] EPA, "Guidelines for Carcinogen Risk Assessment" EPA-630-P-03-001F (2005).

demonstrated effectiveness include granular activated carbon sorption and ion exchange resins.[10]

43. The most common treatment method for PFOA and PFOS contaminated groundwater is extraction and filtration through granular activated carbon. However, because PFOA and PFOS have moderate absorbability, the design specifics are very important in obtaining acceptable treatment.[11] Other potential adsorbents include: ion exchange resins, organo-clays, clay minerals and carbon nanotubes.[12] Evaluation of these sorbents needs to consider regeneration, as the cost and effort required may be substantial. Other *ex situ* treatments including nanofiltration and reverse osmosis units have been shown to remove PFASs from water. Incineration of the concentrated waste would be needed for the complete destruction of PFAS.[13]

44. The costs of decades of PFAS contamination are enormous to public health, the environment, and to state and federal coffers. Federal, state and local governments have only just begun to scratch the surface of identifying PFOA/PFOS contamination. These governmental entities have to budget for environmental investigations, assessments, inspections and monitoring; cleanup, remediation and waste disposal; water filtration and alternative drinking water supplies; health monitoring and biomonitoring; fish sampling; and wastewater and landfill leachate treatment.

---

[10] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); EPA, "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)." EPA 822-R-16- 005 (2016).

[11] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); EPA, "Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)." EPA 822-R-16- 005 (2016).

[12] EPA, "Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS)" EPA 822-R16-004 (2016); Espana, V.A., Mallavarapu, M., and R. Naidu. "Treatment Technologies for Aqueous Perfluorooctanesulfonate (PFOS) and Perfluorooctanoate (PFOA): A Critical Review with an Emphasis on Field Testing." Environmental Technology & Innovation. Volume 4. Pages 168 to 181. (2015).

[13] Minnesota Department of Health (MDH) "MDH Evaluation of Point-of-Use Water Treatment Devices for Perfluorochemical Removal. Final Report Summary." (2008); Vecitis, C.D., Park, H., Cheng, J., and B.T. Mader "Treatment Technologies for Aqueous Perfluorooctanesulfonate (PFOS) and Perfluorooctanoate (PFOA)." Frontiers of Environmental Science & Engineering in China. Volume 3(2). Pages 129 to 151. (2009).

### E. <u>DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF RISKS TO PUBLIC HEALTH AND THE ENVIRONMENT</u>

45. Not long after introducing these "forever chemicals" into regular use, scientists within the 3M Company began to question the environmental impacts of AFFF.

46. Upon information and belief, in 1975, 3M scientists were made aware that PFAS chemicals were bioaccumulating in the bodies of US citizens across the nation.

47. Studies have found PFOS and PFOA in the blood samples of the general human population and wildlife, indicating that exposure to the chemicals is widespread.[14]

a. The wide distribution of PFAS in organisms is strongly suggestive of the potential for bioaccumulation and/or bioconcentration.

48. In 1978, a report identified environmental and public health risks posed by AFFF and noted the "difficulties obtaining adequate information" from 3M.[15] It is believed that at this time 3M was finding PFAS chemicals at levels 1,000 times normal in the blood of its workers and in the flesh of fish surrounding its manufacturing plants.

49. Other manufacturers of AFFF also observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers. Upon information and belief, despite 3M concluding that PFOA and PFOS "should be regarded as toxic," 3M determined that the "risks should not be reported at this time."

50. Upon information and belief, additional animal studies conducted by 3M in 1978 and 1979 further confirmed the public health and environmental risks posed by PFOS and PFOA.

---

[14]US Department of Health and Human Services - Agency for Toxic Substances and Disease Registry. 2018. "Draft Toxicological Profile for Perfluoroalkyls"; EPA 2015, "Long-Chain Perfluoroalkyl Carboxylate and Perfluoroalkyl Sulfonate Chemical Substances; Significant New Use Rule." Proposed Rule. 40 CFR 721. Federal Register: Volume 80 (No. 13).

[15] Department of the Navy, "Candidate Environmental Impact Statement - Discharging Aqueous Film-Forming Foam (AFFF) to Harbor Waters During Tests of Machinery Space Fire-Fighting Foam Systems Aboard U.S. Navy Ships" (1978).

51. In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.

52. By the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

53. In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[16]

54. Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.[17]

55. By 1983 3M's medical officer warned in an internal memo "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

56. Despite the substantial evidence that AFFF was an environmental and public health threat for decades, it was not until 2000 that the EPA announced that "(f)ollowing negotiations between

---

[16] Se*e* Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

[17] *See* Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades.

EPA and 3M, the company...announced that it will voluntarily phase out and find substitutes for PFOS".[18] Along with the announcement of the phase out of PFOS, it was revealed that a 3M animal study revealed significant health risks associated with PFOS exposure even at low doses.

57. From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold PFAS Products, including Teflon nonstick cookware, and more recently PFAS feedstocks for the use in the manufacture of AFFF products.

58. Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold PFAS Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and impacted Plaintiff's public water system.

59. DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[19]

60. By July 2011, DuPont's "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified DuPont of a "probable link" between PFOA exposure and the conditions of pregnancy-induced hypertension and preeclampsia. By October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

---

[18] EPA News Release, "EPA and 3M ANNOUNCE PHASE OUT OF PFOS" (2000) found at https://archive.epa.gov/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html

[19] *See*, *e.g.,* Fred Biddle, "DuPont confronted over chemical's safety," *Wilmington News Journal* (Apr. 13, 2003). The *Wilmington News Journal* is published in Wilmington, Ohio.

61. In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

62. Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold PFAS Products; (2) issued instructions on how PFAS Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFAS to contaminate the surface water, soil, sediment, wastewater, storm water, and/or groundwater in and around the service area of the Plaintiff's public water system; (3) failed to recall and/or warn the users of PFAS Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of PFAS Products, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFAS Products.

63. At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

64. As a direct result of Defendants' actions and/or inactions alleged in this Complaint, upon information and belief, PFAS have and will continue to impact the groundwater, surface water wastewater, stormwater, soil, and/or sediment in and around the service area of Plaintiff's public

water system. This creates an environmental hazard that will exist until Plaintiff fully identifies, delineates, and remediates any PFAS contamination. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, treat, and/or remediate PFAS impacts to the public water system, at significant expense, loss, and damage to Plaintiff.

65. Defendants manufactured, designed, transported, and/or sold AFFF containing PFAS to persons or entities in and around the service area of the Plaintiff's public water system. Upon information and belief, at various times, these end users stored, used, disposed of, and/or discharged Defendants' PFAS bearing AFFF products in and around the service area of the Plaintiff's public water system, leading to impacts to Plaintiff's public water system.

66. Defendants had a duty and breached their duty to evaluate and test such PFAS Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by PFAS Products.

67. Defendants have known for decades that PFAS are toxic and that because AFFF contains PFAS, the release of AFFF poses substantial health and environmental risks. Notwithstanding that knowledge, Defendants persistently and intentionally hid the dangers of PFAS containing AFFF from consumers and the public.

68. Defendants knew, foresaw, and/or reasonably should have known and/or foreseen that PFAS from AFFF Products would more likely than not harm the environment in and around the service area of the Plaintiff's public water system and impact Plaintiff's public water system.

69. Instead of disclosing the dangers associated with PFAS used in AFFF, Defendants went to great lengths to falsely promote AFFF as being safe and appropriate for widespread use.

70. Defendants repeatedly assured and represented to governmental entities, to consumers, and to the public that AFFF exposures presented no risk of harm and were of no legal, toxicological, or medical significance of any kind.

71. At all relevant times, Defendants shared and/or should have shared among themselves, all relevant information relating to the presence, bio-persistence, and bioaccumulation of PFAS from AFFF in the environment and in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

72. At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any harm as alleged herein.

73. At all times pertinent herein, Plaintiff did not know nor should it have known of the likely PFAS impacts to the public water system from AFFF Products as Defendants did not disclose the toxic nature and harmful effects of the AFFF which Defendants designed, manufactured and sold.

74. Plaintiff discovered and pled the claims herein within the applicable statute(s) of limitation or repose.

75. At all relevant times, Defendants, through their acts and/or omissions, took steps to attack, challenge, discredit, and/or otherwise undermine any scientific studies, findings, statements, and/or other information that proposed, alleged, suggested, or even implied any potential adverse environmental damage and health effects or risks and/or any other fact of any legal, toxicological, or medical significance associated with the presence of PFAS in the environment and human

blood.

76. At all relevant times, Defendants, through their acts and/or omissions, concealed and/or withheld information from their customers, governmental entities, and the public that would have properly and fully alerted the Plaintiff to the environmental, toxicological, medical, or other significant risks from PFAS contamination.

77. At all relevant times, Defendants encouraged the continued and increased use and release of AFFF, which caused the release of PFAS into the environment in and around the service area of Plaintiff's public water system by their customers and others, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with AFFF containing PFAS.

78. Upon information and belief, defendants' actions have more likely than not caused PFAS impacts to the public water system.

### F. <u>Dupont's Fraudulent Transfer Scheme Designed to Avoid Liability</u>

79. In approximately 2014, DuPont formed Chemours as a wholly-owned subsidiary. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

80. In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business included at least titanium technologies, fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemors Company FC, LLC (again, collectively "Chemours").

81. In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities that Chemours took on are not publicly available.

82. The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a reasonably equivalent value in exchange for this transfer or obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

83. At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

84. At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

85. Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. This indemnification remains uncapped. Chemours also agreed to indemnify DuPont against and assume for itself the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

86. Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

87. At the time of the DuPont-Chemours spin-off in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

88. Until the completion of the spinoff, Chemours was a wholly-owned subsidiary of DuPont, and even though Chemours had a separate board, the board was controlled by DuPont. After the spin-off, new members of the Chemours board were appointed. The spin-off and related decisions were conducted while DuPont controlled the board. The new Chemours board did not take part in the separation.

89. DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds. Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

90. Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFCs.

91. In 2016, Chemours itself acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

92. Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future

PFOA-related costs not covered by the settlement for the following five years.

93. At the time of the DuPont-Chemours spin-off, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

94. The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spin-off with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liability, including for the claims that arise out of this case, which has and will further harm Plaintiff.

### G. Federal Regulation of PFAS

95. The USEPA has proposed National Primary Drinking Water Regulations and issued multiple health advisories for various PFAS over the last fifteen years.

96. The USEPA may publish health advisories for contaminants that are not subject to any national primary drinking water regulation. 42 U.S.C. 300g–1(b)(1)(F). USEPA develops health advisories to provide information on the chemical and physical properties, occurrence and exposure, health effects, quantification of toxicological effects, other regulatory standards, analytical methods, and treatment technology for drinking water contaminants. USEPA health advisories describe concentrations of drinking water contaminants at which adverse health effects

are not anticipated to occur over specific exposure durations.

97. In 2009, under the authority of 42 U.S.C. 300g–1(b)(1)(F), the USEPA's Office of Water issued its Provisional Health Advisory for short-term exposure to contaminated drinking water at values of 400 ppt for PFOA and 200 ppt for PFOS based on available evidence at that time.

98. In 2014, USEPA released its Draft Health Effects Documents for PFOA and PFOS. These documents identified exposure pathways and potential health effects. The C8 Health Project informed these documents.

99. In May of 2016, USEPA issued its Drinking Water Health Advisories for PFOA and PFOS which considerably lowered the values from the Provisional Health Advisories. To provide Americans with a margin of protection from a life-time of exposure to PFOA and PFOS from drinking water, the USEPA established these health advisory levels at 70 parts per trillion.

100. On June 15, 2022, USEPA issued its Interim Updated Drinking Water Health Advisories for PFOA and PFOS replacing those issued in 2016. USEPA's data and analyses showed that negative health effects could occur at drastically lower levels than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS. The new science underpinning the 2022 Health Advisories indicates that negative health effects may occur with concentrations of PFOA or PFOS in drinking water at levels that are near zero.

101. Based on this new information, USEPA set the Interim Updated Drinking Water Health Advisory levels orders of magnitude lower at 0.004 ppt for PFOA and 0.02 ppt for PFOS. These health advisories are set below any reliable levels of both detection and quantitation. This means that it is possible for PFOA or PFOS to be present in drinking water at levels that exceed USEPA health advisories even if testing results indicate that no amount of the PFAS are detected.

102. On March 14, 2023, the USEPA proposed National Primary Drinking Water regulations

for PFOA, PFOS, perfluorononanoic acid (PFNA), hexafluoropropylene oxide dimer acid (HFPO-DA, commonly known as GenX Chemicals), perfluorohexane sulfonic acid (PFHxS), and perfluorobutane sulfonic acid (PFBS). The proposed Maximum Contaminant Level (MCL) in drinking water for both PFOA and PFOS were set at 4.0 ppt. These proposed MCL's approach the lowest concentration that can be reliably measured. Due to the continued risk of negative health effects, the USEPA also proposes to set the maximum contaminant level goal (MCLG) for PFOA and PFOS at zero.

103. In October 2023, EPA published a final rule in the Federal Register that will provide EPA, its partners, and the public with the largest-ever dataset of PFAS manufactured and used in the United States. This final rule under the Toxic Substances Control Act (TSCA) will require all manufacturers (including importers) of PFAS and PFAS-containing articles in any year since 2011 to report information to EPA on PFAS uses, production volumes, disposal, exposures, and hazards.

104. In January 2024, the EPA announced the automatic addition of seven PFAS to the list of chemicals covered by the Toxics Release Inventory (TRI), consistent with the Fiscal Year 2020 National Defense Authorization Act. TRI reporting will be required for these seven PFAS for the 2024 reporting year.

105. In February 2024, EPA released two proposed regulations under the Resource Conservation and Recovery Act (RCRA) to protect communities from PFAS and other emerging chemicals of concern. These rules would add nine PFAS to the list of RCRA hazardous constituents and would assure that EPA's regulations clearly reflect EPA's and authorized states' authority to require cleanup of the full range of substances that RCRA intended.

106. In April 2024, EPA finalized a critical rule to designate two widely used PFAS – PFOA

and PFOS – as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act, also known as Superfund.

107. In April 2024, EPA issued the first-ever national, legally enforceable drinking water standard to protect communities from exposure to harmful PFAS. The EPA set MCL's for PFOA at 4.0 ppt, PFOS at 4.0ppt, PFHxS at 10.0 ppt, PFNA at 10.0 ppt, HFPO-DA (GenX) at 10.0 ppt. Public water systems must monitor for these PFAS and have three years to complete initial monitoring (by 2027), followed by ongoing compliance monitoring. Public water systems have five years (by 2029) to implement solutions that reduce these PFAS if monitoring shows that drinking water levels exceed these MCLs.

### H. Impacts of AFFF on Plaintiff's Public Water System

108. Plaintiff is the administrator, owner, operator and/or actual possessor of a public water supply system (KS2010317) with the obligation to maintain, operate, and supervise the water systems and the authority to sue relative thereto.

109. Plaintiff has the authority to sue for damages to its public community water system (KS2010317).

110. Upon information and belief, PFAS more likely than not impacts Plaintiff's public water system's drinking water source(s) due to AFFF storage, release, use, and/or disposal within or around the source waters' recharge areas and/or watersheds.

111. Upon information and belief, Plaintiff's public water system, including the drinking water supply source(s), will more likely than not require extensive sampling to identify and delineate the extent of PFAS impacts caused by Defendants' AFFF Products.

112. Plaintiff has or will more likely than not incur significant costs to fully sample its public water system including its drinking water sources for PFAS impacts caused by Defendants' AFFF

Products and to delineate and remediate any PFAS impacts identified.

113. Plaintiff will more likely than not need to upgrade its public water system to comply with anticipated future PFAS regulations due to impacts caused by Defendants' AFFF Products.

**PLAINTIFF IS ENJOINED FROM BRINGING CERTAIN CLAIMS AGAINST CERTAIN DEFENDANTS**

114. Regardless of any language contained within this Complaint, in accordance with this Court's Order, Plaintiff is expressly not bringing any "Released Claims" against any "Released Persons" as those terms are defined in the public water provider settlement agreements to which Plaintiff is a Settlement Class Member including:

115. Settlement Agreement between Public Water Systems and 3M Company originally agreed to on June 30, 2023 (Case No. 2:23-cv-03147-RMG, Entry No. 10-3), as amended by Case No. 2:18-mn-02873-RMG, Doc. No. 3624 on August 29, 2023, and as approved in Case No. 2:18-mn-02873-RMG, Entry No 4754 on March 29, 2024.

116. The Settlement Agreement between Public Water Systems and defendants The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc. originally agreed to on June 30, 2023 (Case No. 2:23-cv-03230, Entry No. 4-2) and as amended by Entry No. 30-1 filed August 7, 2023, and as approved in Case No. 2:18-mn-02873-RMG, Entry No. 4471 on February 8, 2024.

117. Except for the "Released Claims", Plaintiff brings any and all claims available to it under the law and pled herein against the "Released Persons" named herein as Defendants.

**FIRST CAUSE OF ACTION:**
**STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN[20]**

118. Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding

[20] Subject to ¶¶114-117

paragraphs as if fully restated herein.

119. Defendants were engaged in the business of researching, designing, manufacturing, testing, distributing, marketing, and selling PFAS Products.

120. Defendants manufactured, marketed and/or sold AFFF or AFFF components containing PFAS for use in controlling and extinguishing aviation, marine, fuel, and other flammable liquid fuel fires.

121. Defendants knew or should have known that PFAS are hazardous to the environment and to human health.

122. Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFAS, was hazardous to the environment and human health.

123. Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and/or emergency situations in a manner that dangerous chemicals would be released into the environment.

124. Further, Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be stored at military bases, fire stations, airports, fire training facilities, and other facilities, and that the storage systems would likely be used and maintained in a manner that dangerous chemicals would be released into the environment.

125. Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate soil, surface water, stormwater, and/or groundwater supplies if released into the environment.

126. Defendants knew or should have known that the manner in which they were manufacturing, marketing, and/or selling AFFF containing PFAS would more likely than not result in PFAS

impacts to the public water system.

127. Upon information and belief, Plaintiff more likely than not was and continues to be harmed by PFAS containing AFFF Products which were designed, manufactured, marketed, sold and/or distributed by Defendants. These PFAS containing AFFF Products were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

128. Defendants' PFAS containing AFFF Products did not perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable way.

129. Defendants represented, asserted, claimed and/or warranted that their PFAS containing AFFF Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

130. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of PFAS containing AFFF Products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Plaintiff, not to manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

131. Defendants' PFAS containing AFFF Products marketed, sold, and utilized in and around the service area of Plaintiff's public water system were used in a reasonably foreseeable manner and without substantial change in the condition in which the products were sold.

132. Defendants knew, or should have known, that the use of Defendants' AFFF products in their intended manner would more likely than not result in the spillage, discharge, disposal, or release of PFAS into the environment in and around the service area of Plaintiff's public water system.

133. Furthermore, Defendants knew or should have known that their PFAS containing AFFF Products were toxic, could not be contained in the environment, and do not readily degrade.

134. Knowing of the dangerous and hazardous properties of PFAS bearing AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain long-chain PFAS, including PFOA, PFOS, their salts, and/or their precursors.

135. Alternative designs and/or formulations of AFFF were available, practical, and technologically feasible. The use of alternative designs would have reduced or prevented the reasonably foreseeable harm to environment that was caused by the Defendants' manufacture, marketing, and sale of AFFF that contained long chain PFAS, their salts, and/or their precursors.

136. Defendants' PFAS containing AFFF Products used in and around the service area of Plaintiff's public water system were defective in design and unreasonably dangerous because, among other things: (a) long chain PFAS bearing AFFF cause soil, sediment, surface water, and/or groundwater contamination, even when used in their foreseeable and intended manner; (b) even at extremely low levels, long chain PFAS such as PFOA and PFOS render drinking water unfit for consumption; (c) long chain PFAS pose significant threats to public health; and (d) PFAS create real and potential threats to the environment.

137. Upon information and belief, Plaintiff was, is and will continue to be harmed by Defendants' defectively designed PFAS containing AFFF Products.

138. As a direct and proximate result of Defendants' above-described acts and omissions, upon information and belief Plaintiff will more likely than not incur costs and damages related to PFAS impacts to the public water system, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS impacts, operating, maintenance and consulting costs, and legal fees.

## SECOND CAUSE OF ACTION:
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN[21]

139. Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

140. Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing long chain PFAS, salts, or precursors, was hazardous to the environment and human health.

141. Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing long chain PFAS, salts, and/or precursors would more than likely result in PFAS impacts to the public water system.

142. As manufacturers, distributors, suppliers, sellers, and marketers of AFFF Products containing long-chain PFAS, salts, or precursors, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFAS released into the environment especially PFOA and PFOS.

143. Defendants knew that end users would purchase, transport, store, handle, use, and dispose of Defendants' AFFF Products containing long-chain PFAS, salts, or precursors without notice of the hazards that PFAS pose to human health and the environment.

144. Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFAS, despite Defendants' knowledge that PFAS such as PFOA and PFOS were real and potential threats to the environment.

145. Defendants failed to provide sufficient warning to the end users and the public, including

[21] Subject to ¶¶114-117

fire and water officials in and around the service area of Plaintiff's public water system, that the normal use and storage of Defendants' PFAS containing AFFF Products would cause the product to be released into the environment and more likely than not cause PFAS contamination impacts to the sediment, surface water, soil, and/or groundwater.

146. Adequate instructions and warnings on the PFAS containing AFFF Products could have reduced or avoided these foreseeable risks of harm to the environment in and around the service area of Plaintiff's public water system and the threat to public health.

147. AFFF Products containing long-chain PFAS, salts, or precursors, purchased or otherwise acquired from Defendants were used, discharged, and/or released in and around the service area of Plaintiff's public water system, including, but not limited to releases, discharges, spills, and/or leaks at fire stations, airports, live fire scenes, and other facilities.

148. Had Defendants provided adequate warnings, Plaintiff and others could have taken measures to avoid or lessen the exposure to the environment and the public water system.

149. Had Defendants provided adequate warnings, fire fighters and other end users of PFAS containing AFFF Products could have taken steps to reduce or prevent the release of toxic PFAS into the environment, surface water, soil, and/or groundwater in and around the service area of the Plaintiff's public water system.

150. Defendants' PFAS containing AFFF Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

151. Defendants' PFAS containing AFFF Products marketed, sold, used, and/or disposed of in and around the service area of Plaintiff's public water system were defective in design and unreasonably dangerous for the reasons set forth above.

152. Despite the known and/or foreseeable environmental and human health hazards associated

with the use and/or disposal of Defendants' PFAS containing AFFF Products in and around the service area of Plaintiff's public water system, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

153. Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFAS containing AFFF Products.

154. As a direct and proximate result of Defendants' above-described acts and omissions, upon information and belief Plaintiff will more likely than not incur costs and damages related to the PFAS impacts to the public water system, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS impacts, operating, maintenance and consulting costs, and legal fees.

**THIRD CAUSE OF ACTION**

**PUBLIC AND PRIVATE NUISANCE[22]**

155. Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

156. Upon information and belief, Defendants were manufacturers of AFFF Products containing long-chain PFAS, salts, or precursors, that were used, discharged and/or released in a dangerous way, and/or otherwise caused PFAS contamination impacts to the public water system.

157. Defendants owed a duty to Plaintiff to act reasonably and not put inherently dangerous products into the marketplace when they anticipated harm to the public water system

158. Defendants knew or should have known that long chain PFAS, salts, or precursors from AFFF would release and discharge into the environment in and around the service area of Plaintiff's public water system during normal use.

[22] Subject to ¶¶114-117

159. Upon information and belief, through Defendants' acts and omissions, Defendants' PFAS and/or PFAS-containing AFFF Products have more likely than not directly and proximately caused PFAS contamination impacts to the environment that has physically invaded, unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public water system as detailed above.

160. The nuisance created by Defendants is continuing unabated.

161. Defendants designed, manufactured, distributed, marketed, and/or sold their PFAS containing AFFF Products in a manner that created, or participated in creating, a nuisance that unreasonably endangers or injures the property, health, safety, and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

162. Upon information and belief, Defendants by their acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFAS impacts and the perpetual threat of contamination to the public water system as detailed above.

163. Upon information and belief, actual and threatened PFAS impacts caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of the public water system in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

164. Upon information and belief, the use, handling, storage, release, discharge, and/or disposal of Defendants' AFFF containing PFAS has more likely than not impacted the public water system, as detailed above.

165. Plaintiff did not consent to this nuisance and the Defendants should have known that Plaintiff would not consent to such a nuisance.

166. Defendants are jointly and severally responsible to abate the nuisance and ensure that any

PFAS impacts to Plaintiff's public water system does not create a public health risk.

167. Upon information and belief, Defendants' actions and omissions more likely than not unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of public water system.

168. The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFAS to be disbursed throughout the environment in and around the service area of Plaintiff's public water system, including the groundwater, surface waters, stormwater, wastewater, sediment, and soil.

169. Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their PFAS containing AFFF Products into the environment would more likely than not continuously, unreasonably, and seriously endanger and interfere with the ordinary safety, use, benefit, and/or enjoyment of Plaintiff's public water system.

170. As a direct and proximate result of Defendants' above-described acts and omissions, upon information and belief Plaintiff will more likely than not incur costs and damages related to the PFAS impacts to the public water system, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS contamination, operating, maintenance and consulting costs, and legal fees.

## FOURTH CAUSE OF ACTION

## TRESPASS[23]

171. Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

172. Plaintiff is the owner/operator of a public water system. Upon information and belief,

[23] Subject to ¶¶114-117

Plaintiff's public water system is more likely than not impacted by the use of Defendants' PFAS containing AFFF Products. Defendants knew, or in the exercise of reasonable care should have known, that PFAS discharged or released into the soil, sediment, surface water, and/or groundwater in and around the service area of Plaintiff's public water system would more likely than not impact the public water system.

173. Upon information and belief, Defendants failed to properly warn against the use of PFAS containing AFFF Products such that they more likely than not proximately caused and continue to cause PFAS to impact the public water system as detailed above.

174. Defendants were engaged in the business of researching, designing, formulating, handling, training, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS containing AFFF Products and knew or should have known that the subsequent and foreseeable use and disposal of these Products would more likely than not contaminate groundwater, surface water, wastewater, stormwater, sediment, and soil. Thus, the Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity caused noxious and hazardous contaminants and pollutants to enter the groundwater, surface water, wastewater, stormwater, sediment, and soil in and around the service area of Plaintiff's public water system.

175. Upon information and belief, PFAS containing AFFF Products and PFAS compounds manufactured and/or supplied by the Defendants more likely than not continue to impact the public water system as detailed above.

176. Upon information and belief, the impacts to the public water system is more than likely ongoing.

177. Upon information and belief, PFAS more likely than not continue to migrate and impact

the public water system as detailed above.

178. Plaintiff has not consented to, and does not consent to, the trespass or contamination alleged herein.

179. Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

180. Upon information and belief, as a direct and proximate result of the Defendants' acts and omissions alleged herein, Plaintiff's public water system has more likely than not been, and continue to be, impacted by PFAS, causing Plaintiff significant injury and damage.

181. As a direct and proximate result of Defendants' above-described acts and omissions, upon information and belief Plaintiff will more likely than not incur costs and damages related to the PFAS impacts to the public water system, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS contamination, operating, maintenance and consulting costs, and legal fees.

## FIFTH CAUSE OF ACTION

## NEGLIGENCE[24]

182. Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

183. Defendants knew or should have known that exposure to PFAS are hazardous to the environment and to human health.

184. Defendants knew or should have known that PFAS were leaching into the environment from AFFF used for fire protection, training, and response activities.

185. Defendants knew or should have known that PFAS would enter the environment from

[24] Subject to ¶¶114-117

leaks, discharges, and/or releases from the storage, use, and/or disposal of AFFF Products.

186. Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate soil, surface water, stormwater, wastewater, and/or groundwater supplies if released into the environment.

187. Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing, and/or selling AFFF containing long chain PFAS, salts, or precursors would more likely than not result in PFAS impacts to the public water system.

188. Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and/or emergency situations at military bases, fire training facilities, airports, industrial plants, and other facilities, as well as in live fire scenarios, in a manner that dangerous long chain PFAS chemicals would be released into the environment.

189. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of PFAS Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS Products might foreseeably harm, to exercise due care in the marketing, instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' PFAS containing AFFF Products.

190. Defendants owed a duty to Plaintiff to act reasonably and not place inherently dangerous AFFF into the marketplace when its release into the environment, surface water, stormwater, soil, and/or groundwater was imminent and certain.

191. Defendants owed a duty to Plaintiff not to contaminate the environment, surface water, sediment, soil, stormwater, wastewater, and/or groundwater in and around the service area of Plaintiff's public water system with AFFF containing toxic PFAS.

192. Upon learning of releases of PFAS in and around the service area of Plaintiff's public water system, all Defendants owed a duty to warn and notify Plaintiff of the releases of PFAS before it caused injury to the public water system and/or a duty to act reasonably to minimize the damages to Plaintiff.

193. Despite the fact that Defendants knew that PFAS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFAS containing AFFF Products; (b) issued instructions on how PFAS containing AFFF Products should be used and disposed of, thus improperly permitting PFAS to more likely than not impact the public water system; (c) failed to recall and/or warn the users of PFAS bearing AFFF Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the end users of PFAS containing AFFF Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their PFAS containing AFFF Products.

194. Defendants breached their duty of care by allowing the release of PFAS into the environment in and around the service area of Plaintiff's public water system through their failure to warn and notify the end users of AFFF of the danger that PFAS would enter the environment, surface water, stormwater, wastewater, soil, sediment, and/or groundwater.

195. A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the PFAS containing AFFF Products.

196. Defendants' conduct lacked any care and was an extreme departure from what a reasonable company would do in the same situation to prevent harm to public health and the environment.

197. Upon information and belief, Plaintiff was, is, and will more likely than not continue to be harmed by Defendants' conduct and omissions.

198. As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff will more likely than not incur costs and damages related to PFAS impacts to the public water system, including but not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of PFAS contamination, operating, maintenance and consulting costs, and legal fees.

## SIXTH CAUSE OF ACTION

### ACTUAL FRAUDULENT TRANSFER[25]
### (DuPont and Chemours Co.)

199. Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

200. Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

201. The Transfers and Assumed Liabilities were made for the benefit of DuPont.

202. At the time that the Transfers were made and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

203. The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed

[25] Subject to ¶¶114-117

Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

204. Plaintiff has been harmed as a result of the conduct of the Fraudulent Transfer Defendants.

205. Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## SEVENTH CAUSE OF ACTION

**CONSTRUCTIVE FRAUDULENT TRANSFER[26]**
**(DuPont and Chemours Co.)**

206. Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

207. Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

208. Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

209. At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

210. The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

211. Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers, or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

212. At the time that the Transfers were made and Chemours Co. assumed the Assumed

---

[26] Subject to ¶¶114-117

Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

213. Plaintiff has been harmed as a result of the Transfers.

214. Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## EIGHTH CAUSE OF ACTION
## PUNITIVE DAMAGES[27]

215. Plaintiff hereby repeats, realleges, and reasserts each and every allegation in the preceding paragraphs as if fully restated herein.

216. Defendants engaged in conduct that was malicious, oppressive, and/or in reckless disregard of Plaintiff's protected rights more likely than not causing the foregoing damages upon Plaintiff.

217. Defendants' malicious, oppressive, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably impact Plaintiff's public water system.

218. Defendants have caused great harm to Plaintiff, acting with implied malice and an outrageously conscious disregard for Plaintiff's rights and safety, such that the imposition of punitive damages if available is warranted.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof including, but not limited to:

    a. costs and expenses associated with or related to the past, present, and/or future investigation, sampling, testing, and assessment of the extent of PFAS impacts to the public water system;

[27] Subject to ¶¶114-117

b. costs and expenses associated with or related to the past, present, and/or future treatment, remediation, and/or removal of PFAS impacts to the public water system;

c. costs and expenses associated with or related to the past, present, and/or future compliance with state or federal regulation of PFAS;

2. Punitive Damages in an amount sufficient to deter similar wrongful conduct in the future;

3. Consequential damages;

4. Costs and attorneys' fees of this lawsuit as provided by law;

5. Pre-judgment and post-judgment interest as provided by law;

6. An order barring the transfer of DuPont's liabilities for the claims brought in this Complaint; and

7. Any other and further relief as the Court deems just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Dated: September 25, 2026.

**Respectfully submitted,**

*s/ Michael G. Stag*_______________

Michael G. Stag (LA Bar 23314)
Ashley M. Liuzza (LA Bar 34645)
Merritt Cunningham (LA Bar 32843)
STAG LIUZZA, LLC
365 Canal St., Ste. 2850
New Orleans, LA 70130
Phone: (504) 593-9600
Fax: (504) 593-9601
mstag@stagliuzza.com
aliuzza@stagliuzza.com
mcunningham@stagliuzza.com

*Attorneys for Plaintiff*